IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ROSWELL MOTORS, INC.** d/b/a
**ROSWELL NISSAN JEEP KIA, INC.**,

      Plaintiff,

vs.                          No. **CIV 07-185 MCA/DJS**

**NISSAN NORTH AMERICA, INC.**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion for Summary Judgment* [Doc. 35] filed on April 17, 2008. Having reviewed the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion and dismisses this action with prejudice for the reasons set forth below.

## I.    BACKGROUND

On February 22, 2007, Plaintiff Roswell Motors, Inc. d/b/a Roswell Nissan Jeep Kia, Inc. filed this civil action against Defendant Nissan North America, Inc., seeking damages arising from the termination of an agreement to operate an automobile dealership in Roswell, New Mexico. Plaintiff's *Complaint* [Doc. 1] alleges that Defendant violated the New Mexico Motor Vehicle Dealers Franchising Act (Count 1), breached its contract with Plaintiff (Count 2), failed to act in good faith as required by the Automobile Dealer Day in Court Act (Count 3), and negligently misrepresented certain facts concerning the dealership (Count 4).

Defendant timely answered Plaintiff's *Complaint* [Doc. 11] and subsequently filed a motion for summary judgment as to all of Plaintiff's claims [Doc. 35]. The undisputed facts and evidence of record relating to this motion can be summarized as follows.

The Plaintiff in this case, Roswell Motors, Inc., came into existence as a result of a decision by its sole owner, Ceasar Jha, to enter into a series of agreements to purchase the Roswell Nissan Jeep Kia dealership from its prior owner, Victoria Exum, and establish a separate and exclusive facility for the Nissan portion of that dealership. At the time he entered into such agreements and formed Plaintiff Roswell Motors, Inc., Mr. Jha already owned several automobile dealerships with other manufacturers in other parts of the United States; he also had prior experience in purchasing such dealerships and was represented by counsel throughout the negotiation and execution of the agreements. [Jha Dep. at 17-21, 60-62, 71.]

At his deposition, Mr. Jha testified that he first learned of the opportunity to purchase the Roswell Nissan Jeep Kia dealership in 2002 through his contacts at another Kia dealership (Broadway Kia) that he already owned. While Mr. Jha had prior experience running a Kia dealership, he did not have any prior relationship with Defendant at that time, and he did not contact Defendant before agreeing to purchase the assets of the Roswell dealership from Ms. Exum. [Jha Dep. at 43, 60.]

To learn about the Roswell dealership and the market in that area, Mr. Jha instead asked the dealership's prior owner, Ms. Exum, to send him financial statements and a parts inventory. Mr. Jha also called Roswell's Toyota, Honda, and Ford dealers over the phone

"just to see how other dealers were doing in that place."  In addition, Mr. Jha read magazines such as "Automotive News" and talked to other dealership owners that he knew, who said that Nissan is "a good company right now.  It seems like a good opportunity."  Mr. Jha thought that the Kia brand also "had some value to it because of the price point" and because of his prior experience owning another Kia dealership.  [Jha Dep. at 53-57.]

Mr. Jha's next step was to enter into a "Buy-Sell Agreement" with Ms. Exum to purchase the assets of the Roswell Nissan Jeep Kia dealership on or about August 21, 2002.  [Ex. 2 to Doc. 36-3; Jha Dep. at 60-61.]  This initial agreement was simply to purchase the assets of the dealership from Ms. Exum and was contingent on Mr. Jha (or his company) executing further agreements to obtain approvals from Defendant and the other manufacturers whom Mr. Jha had not approached yet.  [Jha Dep. at 63, 68.]

After executing the "Buy-Sell Agreement" with Ms. Exum, Mr. Jha began pursuing additional agreements with Defendant in order to take over the operation of the Nissan dealership that Ms. Exum's company had previously operated.  Mr. Jha's first meeting with Defendant's representatives to discuss taking over the Roswell Nissan dealership occurred on or about September 13, 2002.  At that meeting, Mr. Jha claims he was told by Defendant's representatives that there were problems with the previous dealer's management of the dealership, namely that "she didn't understand fixed operation" and "didn't have the knowledge to execute the market share."  [Jha Dep. at 107-08.]

Mr. Jha also signed a "Confidentiality Agreement" dated September 13, 2002, which states, in relevant part, that:

I acknowledge that owning and operating a dealership is a private business venture that is solely the responsibility of the owners and operators. I also acknowledge that I have conducted my own independent business evaluation of the venture, have reached my own independent decision, and am not relying on the business expertise or decision of Nissan to continue this location, or any representations, statements, actions or inactions by Nissan related to the existing or proposed dealership location as an indication that Nissan represents the venture will be successful or profitable for me. Accordingly, Nissan does not make, nor shall it be deemed by its action or inaction including, but not limited to disclosing to me the names of entities and contacts who want to sell their dealership assets or otherwise referring me to those potential sellers and accepting my application for consideration of whether I be approved as an authorized Nissan dealer, to have made any representations, warranties or guarantees to me with respect to any of these uncertainties or business risks.

[Ex. 3 to Doc. 64; Jha Dep. at 77-82.]

To allow the Roswell Nissan dealership to continue operating during the period when the sale from Ms. Exum to Mr. Jha was pending, Defendant entered into a "Voluntary Termination and Release Agreement" with Mr. Jha and Ms. Exum dated November 6, 2002. [Ex. 5 to Doc. 36-6; Jha Dep. at 159-62.] The "Recitals" section of that agreement made note of the fact that Defendant had terminated its "Nissan Dealer Sales and Service Agreement" with Ms. Exum on October 21, 2002, thus making it necessary to enter into further agreements with Defendant in order to allow the Roswell Nissan dealership to continue operating after that date. [Ex. 5 to Doc. 36-6.]

The "Voluntary Termination and Release Agreement" also contains a provision in which Mr. Jha (as the Buyer) agreed to "satisfy Nissan's standard and usual requirements to become an authorized Nissan Dealer, including the requirement that Buyer execute a Nissan Dealer Term Sales and Service Agreement requiring Buyer, among other things, to

4

complete stand-alone exclusive Nissan Dealership Facilities in accordance with Nissan's Retail Environmental Design Initiative.  The duration of the Term Agreement shall be one (1) year."  [Ex. 5 to Doc. 36-6.]  Thus, by the time Mr. Jha and his counsel had the opportunity to review the "Voluntary Termination and Release Agreement" dated November 6, 2002, they were on notice that there had been problems with the Roswell Nissan dealership that led Defendant to terminate Ms. Exum's operation of that dealership, and that Defendant would require that Mr. Jha (or his company) build a stand-alone, exclusive facility in Roswell as a condition of taking over the dealership.  [Jha Dep. at 159-63.]

Mr. Jha's actual or constructive notice of these issues is further documented in correspondence dating from the period between the execution of the "Voluntary Termination and Release Agreement" discussed above and the execution of the "Nissan Dealer Term Sales and Service Agreement" between Plaintiff and Defendant that gave rise to this litigation.  In a letter dated November 18, 2002, Mr. Jha represented to Defendant that his "first priority" after closing would be "to concentrate efforts in the new facility for the Nissan line."  This letter also gave a proposed time line for constructing this new facility, according to which Mr. Jha was going to "acquire property located at 4100 N. Main, Roswell, NM" within "120 days of closing" and then complete construction of a new facility within "22 months of closing."  [Ex. 6 to Doc. 36-7; Ex. 3 to Doc. 41-3.]

Before closing, Mr. Jha's attorney sent a letter to Ms. Exum's attorney dated January 16, 2003, which noted a number of problems with the Roswell Nissan dealership at that time. Specifically, he noted:  "As a result of what we have seen in the last few days, it is unlikely

5

that there is any goodwill in this business. . . .  With all the creditors in the community that are owed money, it is doubtful that Mr. Jha will be able to open up and find success unless he spends hundreds of thousands of dollars to regain the goodwill for this business.  The fact that he has agreed to increase the Blue Sky to $125,000 defies logic, because the value of this business is close to zero at this time."  [Ex. 4 to Doc. 36-5.]  In his deposition testimony, Mr. Jha also noted concerns with respect to the dealership's parts inventory and parts department, which came to his attention when he brought people with him to inspect the dealership prior to closing.  [Jha Dep. at 87-91.]

Despite these concerns, Mr. Jha and his company went forward with the closing on January 17, 2003, and entered into a "Nissan Dealer Term Sales and Service Agreement" (hereinafter "Term Agreement") dated January 24, 2003, in which Plaintiff is listed as the "Dealer" and Defendant is listed as the "Seller."  [Ex. 7 to Doc. 36-8; Jha Dep. at 173-75.] An exhibit to the Term Agreement, which is incorporated by reference, sets forth the following schedule for the completion of "New Exclusive Dealership Facilities":

   a)     Dealer shall complete the acquisition (by purchase or long-term lease) of land located at 4100 N. Main Street, Roswell, NM  88201 approved by Seller on or before **March 1, 2003**: and

   b)     Dealer will enroll in the Nissan Retail Environmental Design Initiative and Sign Program on or before **March 1, 2003**; and

   c)     Dealer shall schedule and complete the Nissan Retail Environmental Design Initiative design consult on or before **March 15, 2003**; and

   d)     Dealer will submit final architectural plans for the construction of the exclusive, separate an distinct (stand-alone) New Dealership Facilities for Seller's approval on or before **April 15, 2003**; and

f)      Dealer shall submit to Seller a signed contract for the construction of the exclusive, separate, and distinct (stand-alone) New Dealership Facilities on or before **April 15, 2003**; and

g)      Dealer shall commence construction of the exclusive, separate, and distinct (stand-alone) New Dealership Facilities on or before **May 1, 2003**; and

h)      Dealer shall complete construction of the exclusive, separate, and distinct (stand-alone) New Dealership Facilities on or before **December 1, 2003**; and

i)      Dealer shall supply Seller with all needed documents to complete Dealer's Nissan Retail Environmental Design Initiative construction package for the exclusive, separate, and distinct (stand-alone) New Dealership Facilities on or before **January 1, 2004**.

[Ex. 7 to Doc. 36-8; Ex. 1 to Doc. 41-2.]

This exhibit to the Term Agreement also states that:

Failure by Dealer to meet any of the interim deadlines set forth above (excluding unforeseen weather delays and acts of nature) shall constitute a material breach of the Agreement warranting termination and shall constitute good "due cause" under Section 57-16-5(F), et seq. of the New Mexico Annotated Statutes, or any successor statute.

[Ex. 7 to Doc. 36-8; Ex. 1 to Doc. 41-2.] Elsewhere the tenth article of the Term Agreement reiterates that:  "Dealer's failure to carry out fully all of the terms and provisions of this Agreement, including those terms and provisions incorporated herein by reference, shall be a breach of the entire agreement, and Seller shall be under no obligation to Dealer to extend this Agreement in whole or in part or to enter into a regular Nissan Dealer Sales & Service Agreement with Dealer or be under any other obligation to Dealer."  [Ex. 1 to Doc. 41-2.]

Plaintiff subsequently failed to meet any of the aforementioned deadlines for constructing the New Dealership Facilities called for in the Term Agreement.  Specifically,

Plaintiff did not acquire the "4100 N. Main Street" site or any other suitable site on which to build the New Dealership Facilities in Roswell.  Having failed to carry out this first step toward constructing the facilities, Plaintiff missed all of the other deadlines as well.  [Jha Dep. at 164-65, 182-83, 188, 193, 199, 203; Reese Dep., Ex. 8 to Doc. 36-9.]

The correspondence between Mr. Jha and Defendant reflects that during the period of time set forth in the Term Agreement, Mr. Jha was encountering problems with the acquisition of the property at 4100 N. Main in Roswell that was identified in the Term Agreement as the site for the New Dealership Facilities.  Mr. Jha requested extensions of time to find and purchase a suitable site, but Defendant denied these requests.  [Ex. 10 to Doc. 36-11; Ex. 17 to Doc. 36-18;  Ex. 4 to Doc. 41-3; Ex. 8 to Doc. 41-3;]

Defendant instead sent Plaintiff and Mr. Jha a series of letters, culminating in a Notice of Termination dated December 22, 2003, based on Plaintiff's failure to meet the schedule set forth in the Term Agreement for constructing the New Dealership Facilities.  [Ex. 10 to Doc. 36-10; Ex. 11 to Doc. 36-11.]  On February 25, 2004, Defendant sent Plaintiff and Mr. Jha another Notice of Default based on Plaintiff's failure to maintain the wholesale financing and capitalization necessary to run the Nissan dealership.  [Ex. 13 to Doc. 36-14.]

Although Plaintiff subsequently entered into a settlement agreement with the third-party lender who had cancelled Plaintiff's wholesale financing [Ex. 12 to Doc. 36-13], there were no further efforts to resolve Plaintiff's dispute with Defendant, and Defendant terminated Plaintiff's Nissan dealership on March 24, 2004.  [Ex. 14 to Doc. 36-15.]  By the

latter date, Plaintiff still had not completed even the first step of acquiring a suitable site for the New Dealership Facilities.

Plaintiff filed this civil action against Defendant almost three years later on February 22, 2007.  When his deposition was taken on January 15, 2008, Mr. Jha stated additional reasons for Plaintiff's delays in moving forward with the acquisition and construction of the New Dealership Facilities called for in the Term Agreement.  First, Mr. Jha alluded to problems in the Roswell market which indicated to him that it could not support a stand-alone Nissan dealership during the time period specified in the Term Agreement. Specifically, Mr. Jha stated his belief that the majority of vehicles sold in the Roswell area are trucks, but Defendant did not offer a full-size pickup truck (the "Titan") until the end of the year 2003.  [Jha Dep. at 171-72; Igo Dep. at 39-40.]  Mr. Jha also cited problems with advertising in the Roswell market, noting that the local television stations for that market are based out of Albuquerque and did not run Nissan commercials mentioning his Roswell dealership.  [Jha Dep. at 139-40.]

Finally, Mr. Jha stated his belief that the proposed site of the New Dealership Facilities, as well as the dates set forth in the Term Agreement for the acquisition and construction of such facilities, were just "randomly picked" and were never meant to be material or enforceable parts of the agreement because they were not a "realistic objective to meet."  Mr. Jha thought that the Term Agreement's schedule for completing the New Dealership Facilities was just a "formality" or "boilerplate" that could  be changed at a later date, based on oral discussions that an unidentified representative of Defendant had with

another individual (identified in Mr. Jha's deposition as "Heather"). [Jha Dep. at 177-78, 180-85.] Defendant denies making such representations and contends that any oral discussions which took place did not modify the express terms of the contract.

## II. ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See id. at 248. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge

and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995).  The Court may, however, consider admissions by a party opponent, see Fed. R. Evid. 801(d)(2), statements admissible for the limited purpose of showing their effect on the listener, see Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993), statements which constitute verbal acts or operative facts because legal consequences flow from their utterance, see Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001), and other statements which fall under an exception to the hearsay rule, see, e.g., Fed. R. Evid. 803(3) (allowing for consideration of statements as circumstantial proof of the knowledge, intent, or state of mind of the declarant).

In applying the procedure set forth in Fed. R. Civ. P. 56, the Court also may consider any undisputed material facts set forth in the motion papers which are deemed admitted by operation of D.N.M. LR-Civ.56.1.  See LaMure v. Mut. Life Ins. Co. of N.Y., 106 F.3d 413, 1997 WL 10961, at *1 (10th Cir. 1997) (unpublished disposition); Smith v. E.N.M. Med. Ctr., 72 F.3d 138, 1995 WL 749712, at *4 (10th Cir. 1995) (unpublished disposition); Waldridge v. American Hoechst Corp., 24 F.3d 918, 920-24 (7th Cir.1994) (approving use of local rule similar to D.N.M. LR-Civ. 56.1(b)).  "Admissions in a party's pleadings or in a pretrial order are similarly binding." Underberg v. United States, 362 F. Supp. 2d 1278,

1283 (D.N.M. 2005). "However, a party generally may not introduce statements from its own answers to interrogatories or requests for admission as evidence because such answers typically constitute hearsay when used in this manner." Id. (citations omitted).

When, as here, a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998). In this instance, the Court elects to disregard the supplemental affidavit of Heather Guilliom filed on June 25, 2008 [Doc. 47], in lieu of inviting a surreply. Because the Court does not consider the supplemental affidavit, it is unnecessary to address the merits of *Plaintiff's Motion to Strike* [Doc. 49], and that motion is denied as moot.

Apart from the procedural and evidentiary limitations discussed above, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B.   Plaintiff's Federal Claim

The only claim asserted in Plaintiff's *Complaint* [Doc. 1] which arises under federal law is that Defendant failed to act in good faith as required by the Automobile Dealer Day

in Court Act (ADDCA), 15 U.S.C. § 1221.  This federal statute defines "good faith" as encompassing "the duty . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party."  15 U.S.C. § 1221(e).  Thus, an ADDCA claim requires evidence of actual or threatened coercion or intimidation by the manufacturer in order to survive a motion for summary judgment.  See Wagner and Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc., 539 F. Supp. 2d 461, 473 (D. Mass. 2008) (collecting cases).  Such coercion or intimidation "'must include a wrongful demand that would result in penalties or sanctions if not complied with.'"  Id. (quoting George Lussier Enters., Inc. v. Subaru of New England, Inc., 393 F.3d 36, 43 (1st Cir. 2004)).

In this case, it is undisputed that Defendant made a demand that Plaintiff construct an exclusive facility for the Roswell Nissan dealership by a date certain, and the penalty or sanction for Plaintiff's failure to comply with this demand in a timely manner was the termination of the dealership.  Nevertheless, Defendant is entitled to summary judgment on Plaintiff's ADDCA claim because the admissible evidence of record does not support a reasonable inference that Defendant's demand for timely construction of an exclusive facility was *wrongful*.

In this regard, courts have held that a "demand that a dealer comply with the terms of a valid franchise agreement cannot qualify as wrongful" for purposes of an ADDCA claim. Id. at 473-74 (citations omitted).  To be wrongful, the demand for an exclusive facility must be coupled with a threat to take away or withhold a benefit to which the dealer is already

13

entitled.  Thus, it is not wrongful for a manufacturer to arrange a *quid pro quo* in which the dealer agrees to construct an exclusive facility in exchange for some future benefit from the manufacturer to which the dealer would not otherwise be entitled.  See Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., Inc., 773 F.2d 1193, 1210-11 (11th Cir. 1985).

At the time Defendant entered into the "Voluntary Termination and Release Agreement" with Mr. Jha and Ms. Exum dated November 6, 2002, Defendant had already terminated its "Nissan Dealer Sales and Service Agreement" with Ms. Exum.  [Ex. 5 to Doc. 36-6; Jha Dep. at 159-62.]  Thus, Ms. Exum no longer had the rights to continue operating the Roswell Nissan dealership in the future and could not transfer such rights to Plaintiff or Mr. Jha without meeting Defendant's uniform requirements for appointing a new dealer.  See Chic Miller's Chevrolet, Inc. v. General Motors Corp., 352 F. Supp. 2d 251, 258 (D. Conn. 2005); Maple Shade Motor Corp. v. Kia Motors Am., Inc., 260 Fed. Appx. 517, 518-19 (3rd Cir. 2008) (unpublished disposition).

It follows that neither Plaintiff nor Mr. Jha had any pre-existing right to continue operating the Roswell Nissan dealership or receive Nissan vehicles from Defendant at the time Mr. Jha first agreed to purchase the dealership's assets from Ms. Exum or at the time he first decided to enter into the agreement with Defendant to construct an exclusive facility for the Roswell Nissan dealership by a date certain.  Rather, the schedule for constructing the exclusive new Nissan facility was part of the *quid pro quo* that Plaintiff bargained for in exchange for obtaining the rights to operate (or continue operating) the Roswell Nissan dealership in the future.

14

To support his assertion that this schedule was not what he bargained for, Mr. Jha points to alleged oral representations which led him to believe that the schedule set forth in the Term Agreement was just a "formality" that was "randomly picked" with no intention of abiding by it.  These alleged oral representations are hearsay because Mr. Jha only heard of them through an unsworn statement attributed to another individual ("Heather"), and that individual's unsworn statements are being offered to prove the truth of the matter asserted (*i.e.*, that Defendant or its agents made certain representations about modifying the schedule). Such hearsay statements cannot be considered in ruling on a summary-judgment motion. See Gross, 53 F.3d at 1541.  Thus, for purposes of its motion for summary judgment, it is unnecessary for Defendant to rebut such hearsay with the supplemental affidavit of Heather Guilliom [Doc. 46-2] filed on June 25, 2008.

Plaintiff offers no other legal grounds which would justify Mr. Jha's reliance on a belief that the schedule set forth in the Term Agreement was immaterial or unenforceable. Such a belief is contradicted by the agreement's express terms, which state that:

> Failure by Dealer to meet any of the interim deadlines set forth above (excluding unforeseen weather delays and acts of nature) shall constitute a material breach of the Agreement warranting termination and shall constitute good "due cause" under Section 57-16-5(F), et seq. of the New Mexico Annotated Statutes, or any successor statute.

[Ex. 7 to Doc. 36-8; Ex. 1 to Doc. 41-2.]  Plaintiff points to no evidence of "unforeseen weather delays" or "acts of nature," and elsewhere the tenth article of the Term Agreement reiterates that:

> Dealer's failure to carry out fully all of the terms and provisions of this Agreement, including those terms and provisions incorporated herein by reference, shall be a breach of the entire agreement, and Seller shall be under no obligation to Dealer to extend this Agreement in whole or in part or to enter into a regular Nissan Dealer Sales & Service Agreement with Dealer or be under any other obligation to Dealer.

[Ex. 1 to Doc. 41-2.]

While New Mexico's courts follow a contextual approach to contract interpretation, this approach does not preclude this Court from determining that the language from the Term Agreement quoted above is unambiguous as a matter of law.  See Mark V, Inc. v. Mellekas, 114 N.M. 778, 781-82, 845 P.2d 1232, 1235-36 (1993).  To the extent that it is admissible, the extrinsic evidence concerning the economic and practical issues that Plaintiff may have faced after entering into the agreements with Defendant does not support a reasonable inference that the schedule for completing the exclusive facility for the Roswell Nissan dealership was non-binding or subject to change based on Mr. Jha's view of those issues alone.  "To hold otherwise would render the 'good faith' standard for franchise termination under 15 U.S.C. § 1222 meaningless, and invite a battle over economic or sales data entirely unconnected to the clear terms of either the statute or the contract."  Wagner, 539 F. Supp. 2d at 474.  Such a battle over economic or sales data would in turn require expert testimony regarding the economic conditions at the time, which is absent here.

For these reasons, the Court determines that Plaintiff has failed to present admissible evidence to show that Defendant's demand for completion of an exclusive facility by a date

certain was wrongful, coercive, or lacking good faith.  Therefore, Defendant is entitled to summary judgment as a matter of law on Plaintiff's ADDCA claim.

### C.    Plaintiff's State-Law Claims

#### 1.    Supplemental Jurisdiction

Plaintiff's remaining claims arise under state law and are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).  "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Before doing so, however, the Court must consider whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction over the state-law claims.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  In this case, the Court concludes that these factors weigh in favor of retaining jurisdiction because Plaintiff's state-law claims are closely intertwined with the federal claim and rely on the same set of facts.  In addition, the parties have had the opportunity to complete discovery and briefing as to all of these claims. Accordingly, the Court elects to exercise supplemental jurisdiction over Plaintiff's state-law claims and resolve all of the claims addressed in Defendant's motion in this *Memorandum Opinion and Order*.

#### 2.    New Mexico's Motor Vehicle Dealers Franchising Act

Plaintiff alleges that Defendant violated two provisions of the New Mexico Motor Vehicle Dealers Franchising Act (MVDFA) by terminating the Roswell Nissan dealership

without "due cause" in violation of N.M. Stat. Ann. § 57-16-5(F), and by attempting to force Plaintiff to relocate the dealership for another manufacturer (*i.e.*, Jeep or Kia), <u>id.</u> § 57-16-5(T).  The New Mexico Supreme Court discussed the history and background of the MVDFA in <u>Key v. Chrysler Motors Corp.</u>, 1996-NMSC-038, 121 N.M. 764, 918 P.2d 350. This statute "was modeled after its federal counterpart . . . enacted by Congress in 1956," and there is comparable legislation in other states which may aid in its interpretation.  <u>Id.</u> at 770-72, 918 P.2d at 356-58.

Neither party cites the <u>Key</u> opinion or any other authority from New Mexico's appellate courts to guide the statute's application to the facts of the present case.  The statute's application is aided, however, by the express language of the Term Agreement, which states that:

> Failure by Dealer to meet any of the interim deadlines set forth above (excluding unforeseen weather delays and acts of nature) shall constitute a material breach of the Agreement warranting termination and shall constitute good "due cause" under Section 57-16-5(F), et seq. of the New Mexico Annotated Statutes, or any successor statute.

[Ex. 7 to Doc. 36-8; Ex. 1 to Doc. 41-2.]  Given this clear and unambiguous language and the lack of admissible extrinsic evidence to support a reasonable inference that the deadlines in the Term Agreement were subject to change, I must reject Plaintiff's argument that compliance with such deadlines was not a material term of the agreement.

Courts in other states interpreting similar statutory and contractual language have come to the conclusion that failure to comply with the contractual deadlines for completing a new facility constitutes "good cause" or "due cause" for terminating a dealership.  <u>See, e.g.,</u>

Wagner, 539 F. Supp. 2d at 467-72 (interpreting Massachusetts statute); Maple Shade Motor

Corp. v. Kia Motors of Am., Inc., 384 F. Supp. 2d 770, 777 (D.N.J. 2005) (interpreting New

Jersey statute), aff'd 260 Fed. Appx. 517 (3d Cir. 2008). I reach the same conclusion here.

Like the statutes of other states, the MVDFA requires the Court to consider a number

of factors in determining whether the termination of the franchise is supported by due cause,

namely:

> the dealer's sales in relation to the business available to the dealer; the dealer's
> investment and obligations; injury to the public welfare; the adequacy of the
> dealer's sales and service facilities, equipment and parts; the qualifications of
> the management, sales and service personnel to provide the consumer with
> reasonably good service and care of new motor vehicles; the dealer's failure
> to comply with the requirements of the franchise; and the harm to the
> manufacturer or distributor.

N.M. Stat. Ann. § 57-16-5(F). For the reasons previously stated, Plaintiff's failure to meet

any of the contractual deadlines for constructing a new exclusive facility for the Roswell

Nissan dealership constitutes a "failure to comply with the requirements of the franchise,"

and absent this new facility, Plaintiff cannot show that its existing, shared sales and service

facilities were adequate to meet the requirements of the Term Agreement.

In its response brief, Plaintiff relies on the alternative argument that the construction

of a new facility was not feasible in the time frame provided in the Term Agreement because

Nissan sales in the Roswell area were too slow to support such an investment at that time,

and because a new facility could not be completed in such a short time frame. These types

of arguments were considered and rejected in the cases cited above, and I reject Plaintiff's

arguments in the present case for substantially the same reasons. "If the normal ebb and flow

of consumer demand in a market-based economy were adequate grounds for excusing contractual performance, scarcely any contract could be enforced at all." <u>Wagner</u>, 539 F. Supp. 2d at 472. Further, Plaintiff presents no expert testimony or documentation to support Mr. Jha's conclusory assertions about the state of the Roswell market in 2003.

Plaintiff's assertions regarding the impracticability of meeting the contractual deadlines for building a new facility might have more significance if the evidence of record supported a reasonable inference that Plaintiff substantially complied with at least some of the initial deadlines (such as those for acquiring a suitable site and preparing construction documents), and if he could point to more tangible reasons for a delay in completing construction of the new facilities. <u>See</u> <u>Maple Shade Motor Corp.</u>, 384 F. Supp. 2d at 775-76. But given the undisputed fact that Plaintiff failed to comply with *any* of the deadlines relating to the New Dealership Facilities required under the Term Agreement at *any* time, I conclude that Defendant is entitled to summary judgment on Plaintiff's claim under Section 57-16-5(F) of the MVDFA.

I also conclude that Defendant is entitled to summary judgment on Plaintiff's claim under Section 57-16-5(T) of the statute. This section of the MVDFA provides, in relevant part, that it is unlawful for a manufacturer (such as Defendant) to "force a dealer to sell or relocate a franchise with another manufacturer located at the same physical location," but that the manufacturer "may require . . . that the dealership meet the manufacturer's facilities requirements." N.M. Stat. Ann. § 57-16-5(T).

Again Plaintiff's response brief cites no legal authority from New Mexico's appellate courts, or any other Court, to support its assertion that Defendant violated this provision of the statute. The plain language of the MVDFA, taken in the context of the legislative history articulated in Key, 1996-NMSC-038, strongly suggests that Section 57-16-5(T) has no application to the facts of this case. The evidence of record does not show that Defendant ever asked (much less forced) Plaintiff to sell or relocate the franchises for the other manufacturers (Jeep or Kia). Rather, all that Defendant demanded was that Plaintiff construct a new and separate facility for the Nissan dealership in order to meet the manufacturer's facilities requirements.

Moreover, at the time this demand was made, Plaintiff and Mr. Jha were in the position of *prospective franchisees* who still had the option of not entering into a dealership agreement with Defendant or closing the sale with the dealership's prior owner if they felt such a demand was too onerous. The New Mexico Supreme Court has indicated that the MVDFA does not apply to prospective franchisees under this type of scenario. See Key, 1996-NMSC-038, 121 N.M. at 772, 918 P.2d at 358. And for the reasons previously stated, the evidence of record does not support a reasonable inference that Defendant *forced* Plaintiff to sell or relocate the franchises for any other manufacturer, given that the demand for a new Nissan facility came as part of a *quid pro quo* in which compliance with this demand was exchanged for a future benefit from Defendant to which Plaintiff would not otherwise be entitled. Therefore, Defendant is entitled to summary judgment on this claim as well.

21

3. **Breach of Contract**

Plaintiff's next claim is that Defendant breached several provisions of the Term Agreement, thereby excusing Plaintiff from the requirement of building an exclusive facility for the Nissan dealership according to the schedule set forth therein.  Specifically, Plaintiff cites the following provisions in the introductory section of the  Term Agreement:

1.      "Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the Consuming Public."

2.      "It is the responsibility of Seller to market Nissan Products throughout the Territory."

3.      "It is recognized that:  Nissan North America, Inc. (hereinafter called "Manufacturer") will endeavor to provide motor vehicles that offer outstanding value to the consuming public."

4.      "Seller and Dealer shall . . . engage in no discourteous, deceptive, misleading or unethical practices or activities."

[Ex. 1 to Doc. 41-2, at 1.]

According to Plaintiff, Defendant's unwillingness to extend or waive the deadlines for completing the New Dealership Facilities contained elsewhere in the Term Agreement evinces a "discourteous, deceptive, misleading or unethical" practice or activity, as well as a failure to "deal fairly" with Plaintiff.  This contention is meritless.

It is a fundamental rule of contract interpretation that "specific terms and exact terms are given greater weight than general language," and that "separately negotiated or added terms are given greater weight than standardized terms."  Restatement (Second) of Contracts §§ 203(c), (d) (1981).  Thus, Plaintiff cannot rely on the generic language at the beginning

22

of the contract to nullify or supersede the more specific and separately negotiated language concerning deadlines for the New Dealership Facilities that is incorporated elsewhere in the contract.  See Chic Miller's Chevrolet, Inc., 352 F. Supp. 2d at 256-57; cf. Public Service Co. of N.M. v. Diamond D Constr. Co., 2001-NMCA-082, ¶¶ 19-20, 131 N.M. 100, 33 P.3d 651 (citing Section 203 of the Restatement in support of "the well-established rule that particular provisions should not be read to annul other provisions unless there is no other reasonable interpretation").

There is nothing unreasonable, unfair, discourteous, deceptive, misleading or unethical about requiring a party to comply with deadlines which are spelled out explicitly in the contract, especially where the contract also specifies in plain language that a failure to comply with those deadlines "shall constitute a material breach of the Agreement warranting termination."  [Ex. 1 to Doc. 41-2.]  And for the reasons previously stated, Plaintiff has not come forward with any admissible evidence to support Mr. Jha's belief that the deadlines specified in the Term Agreement were mere formalities that were never intended to be enforced.

Plaintiff's next contention is that Defendant failed to abide by its contractual responsibility "to market Nissan products throughout the territory" because Mr. Jha saw television commercials for Nissan products that identified or "tagged" an Albuquerque Nissan dealership instead of the Roswell Nissan dealership.  This contention lacks merit because, among other things, Plaintiff has presented no admissible evidence that Defendant (as opposed to the Albuquerque Nissan dealer identified in the advertisement) was

23

responsible for placing these commercials on the air.  [Jha Dep. at 139-42.]  Further, the cited portion of the Term Agreement only calls for marketing "Nissan products," not any specific dealership.

Plaintiff also asserts that Defendant breached the provision in the Term Agreement requiring it to "endeavor to provide motor vehicles that offer outstanding value to the consuming public," because Nissan did not add a full-size pickup truck (the "Titan") to its product line until the end of the year 2003.  Plaintiff cites no legal authority to support the proposition that "motor vehicles that offer outstanding value to the consuming public" should be construed to mean "motor vehicles that are best suited to the Roswell market during a particular time period."  If such generic contractual language were subject to this type of flexible interpretation, then it could just as easily be construed to mean "motor vehicles with the best fuel economy," which might exclude the full-size pickup trucks that Plaintiff desired in 2003.

The evidence of record indicates that Defendant's product line was known to Mr. Jha before he decided to purchase the dealership in question, and his personal opinions about consumer preferences in the Roswell market in the year 2003 do not support a reasonable inference that the addition of a full-size pickup truck to the Nissan line would have made any significant difference with respect to Plaintiff's compliance with the contractual deadlines at issue here.  Had Plaintiff complied with those deadlines, the evidence of record suggests that Plaintiff would have been poised to market the new Nissan Titan pickup truck from the

newly completed dealership facilities at about the same time this new truck model first reached the Roswell area (*i.e.,*December 2003).

Finally, the Term Agreement specifically lists the permissible grounds for delaying the construction schedule for the New Dealership Facilities, namely "unforeseen weather delays and acts of nature."  Mr. Jha's concerns about Nissan's lack of a full-size pickup truck or commercials for his dealership are not on this list.  Cf. In re Villa West Assoc., 146 F.3d 798, 805 n.6 (10th Cir. 1998) (citing "the maxim *expressio unius est exclusio alterius,*" meaning "the mention or inclusion of one thing implies the exclusion of another").  For all of the above reasons, Defendant is entitled to summary judgment on each of Plaintiff's breach-of-contract claims.

### 4.    Negligent Misrepresentation

Plaintiff's final contention is that Defendant engaged in negligent misrepresentation.  In its answers to interrogatories, Plaintiff alleges a number of instances in which Defendant or its agents failed to disclose information about the Roswell dealership or the viability of the Roswell market prior to Mr. Jha's purchase of that dealership.  [Ex. 15 to Doc. 36-16.]

Plaintiff may not rely on its answers to interrogatories to defeat Defendant's motion for summary judgment on this claim because such answers are self-serving hearsay.  See Underberg, 362 F. Supp. 2d at 1283.  In addition, New Mexico law does not provide a cause of action for negligent nondisclosure of information under the circumstances alleged here.

New Mexico courts have instead adopted the tort of negligent representation defined in the Restatement (Second) of Torts, § 552 (1977).  See McElhannon v. Ford, 2003-NMCA-

25

091, ¶ 10, 134 N.M. 124, 73 P.3d 827.  "On its face, Section 552 appears to apply only to affirmative misrepresentations."  Id.  The New Mexico Court of Appeals has declined to extend the scope of this tort to reach negligent nondisclosure in an arms-length business transaction, because in that context the duty to disclose "arises only when the defendant has *actual knowledge* of both the undisclosed information and the fact that the plaintiff is proceeding in ignorance of facts basic to the transaction; it is not enough to show that the defendant should have known the information or its importance to the plaintiff."  Id. ¶ 13.  A claim which rests on allegations of actual knowledge "sounds solely in deceit," id. ¶ 14, and in this case no such claim is pled with the requisite specificity in Plaintiff's *Complaint*.

It follows that Plaintiff must come forward with admissible evidence of an affirmative misrepresentation by Defendant or its agents in order to survive Defendant's motion for summary judgment on the negligent misrepresentation claim.  See, e.g., Gilmore v. Duderstadt, 1998-NMCA-086, ¶ 33, 125 N.M. 330, 961 P.2d 175 (concluding that evidence of profit and loss statements, combined with expert testimony showing that these statements misrepresented net profits by approximately $90,000, was sufficient to support a jury's verdict on a negligent misrepresentation claim).  Recognizing this requirement, Plaintiff's response to Defendant's motion for summary judgment abandons some of the allegations previously stated in its answers to interrogatories and instead bases its negligent-misrepresentation claim on Defendant's alleged oral representations to the effect that the deadlines for the New Dealership Facilities listed in the Term Agreement were immaterial or subject to change.

Unlike <u>Gilmore</u>, 1998-NMCA-086, ¶ 33, the evidence of record in the present case contains no documentary evidence or expert testimony to substantiate Plaintiff's allegation that such a representation was made, and for the reasons previously stated, Mr. Jha's deposition testimony that he heard of such a representation through another individual named "Heather" is inadmissible hearsay.  Because Plaintiff has failed to come forward with admissible evidence of an affirmative misrepresentation regarding the materiality or enforceability of the deadlines stated in the Term Agreement, it is unnecessary to address the other elements of Plaintiff's negligent misrepresentation claim.  Defendant is entitled to summary judgment as a matter of law on this claim as well.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant is entitled to summary judgment on all of Plaintiff's claims, and this action must be dismissed with prejudice.

**IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. 35] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to Strike Defendant's Notice of Filing Supplemental Affidavit* [Doc. 49] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the PRETRIAL CONFERENCE previously set for Tuesday, August 5, 2008, at 9:00 a.m., the CALL OF THE CALENDAR previously set for Thursday, September 4, 2008, at 9:00 a.m., and the JURY SELECTION/TRIAL previously set for Monday, September 8, 2008, at 9:00 a.m. are **VACATED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**, this 30th day of June, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge